OREGON CHROME MINES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 18515, 23902.  Promulgated October 4, 1950.

*William B. Murray, Esq.*, for the petitioner.
*Robert G. Harless, Esq.*, for the respondent.

OPINION.

Hill, *Judge:* The narrow question for our determination in this proceeding is whether petitioner was "engaged in the mining" of chromite within the meaning of section 731[1] of the Code during the taxable year 1944 so that its adjusted excess profits net income was exempt from the excess profits tax. Section 731 was first enacted into law as part of the Second Revenue Act of 1940. The purpose of the statute was to stimulate the domestic discovery and production of certain strategic materials, including chromite, of which there was a shortage in this country. The exemption granted by section 731 was withdrawn by the Revenue Act of 1941 with respect to taxable years beginning after December 31, 1940. The exemption was subsequently restored in substantially the same form by the Revenue Act of 1942. Section 207 of the Revenue Act of 1943 added to the list of strategic materials set out in the statute.

Our first consideration is the scope Congress intended to give the phrase "engaged in mining." No definition of these words is contained within section 731. We have carefully searched the legislative history of this section and found no clear-cut standards set forth for determining whether a corporation is "engaged in mining" within the statute. The regulations relating to section 731, Regulations 109, section 30.731–1 and its successor, Regulations 112, section 35.731–1, are of no help in clarifying the statutory phrase in question, and no court decisions have interpreted the language. Elsewhere in the Code

---

[1] SEC. 731. CORPORATIONS ENGAGED IN MINING OF STRATEGIC MINERALS.

In the case of any domestic corporation engaged in the mining of * * * chromite * * *, the portion of the adjusted excess profits net income attributable to such mining in the United States shall be exempt from the tax imposed by this subchapter. The tax on the remaining portion of such adjusted excess profits net income shall be an amount which bears the same ratio to the tax computed without regard to this section as such remaining portion bears to the entire adjusted excess profits net income.

under section 114 (b) (4) (B)[2] Congress gave a broader than usual definition of "mining" and by the express language of that subparagraph its principles are applicable in determining gross income attributable to mining for the purposes of section 731. It states that "mining," as used therein, includes "not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products." The more usual and ordinary definition of "mining" does not include the treatment processes. Webster's New International Dictionary, 2d Ed., states that "mining" is the "Act or business of making or of working mines." Black's Law Dictionary, 3d Ed., defines "mining as "the process or business of extracting from the earth the precious or valuable metals, either in their native state or in their ores." Corpus Juris Secundum, Vol. 58, page 35, section 3, declares that " 'mining', as generally defined, is the process of extracting from the earth the rough ore or mineral; the act or business of making mines or working them." The Court of Appeals for the Tenth Circuit stated in *Chicago Mines Co.* v. *Commissioner*, 164 Fed. (2d) 785. 787 that " 'mining' thus connotes the removal of minerals from a natural deposit * * *."

It is possible that Congress intended that the broad definition of "mining" set forth in section 114 (b) (4) (B) should serve not only to determine income attributable to mining within section 731, but also that this definition should furnish a guide post for determining whether a corporation was "engaged in mining" under the same section. In any event, whether we are guided by the statutory definition or by the usual and ordinary definition of "mining", we are convinced by the evidence that petitioner was not engaged in the mining of chromite for the purposes of section 731 in the taxable year.

In 1944 petitioner played an entirely passive role in the chrome mining industry as lessor of the Agnes mining claims, and received all of its income in the form of royalties from Robertson, the lessee.

---

[2] SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.

*     *     *     *     *     *     *

(b) BASIS FOR DEPLETION.—

*     *     *     *     *     *     *

(4) PERCENTAGE DEPLETION FOR  *  *  *  METAL MINES  *  *  *

*     *     *     *     *     *     *

(B) Definition of Gross Income From Property.—As used in this paragraph the term "gross income from the property" means the gross income from mining. The term "mining", as used herein, shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products. * * * The principles of this subparagraph shall also be applicable in determining gross income attributable to mining for the purposes of section 731 and 735.

Following the lease agreement of April 14, 1942, petitioner had performed no function nor taken any financial risk in exploring these mining properties for ore, developing mines, extracting chromite therefrom and marketing the same. Nor was petitioner engaged in any other mining operations during the taxable year. There is evidence that it directed a few inquiries toward the purchase of other chrome mining claims and on one occasion authorized the expenditure of $3,000 to acquire chrome which had already been mined. These negligible activities fall far short of any active policy of locating and developing other chrome deposits. We do not attach much significance to the fact that in the brief period from June 24, 1941, until April 12, 1942, petitioner explored and developed the Agnes mining properties to a limited extent. These same claims had previously been located and worked in World War I and were relocated and examined prior to petitioner's incorporation. There is no affirmative evidence that petitioner found any mineable deposit of chromite therein prior to April 12, 1942, and the express terms of the lease on that date plus the small capital commitment by petitioner for exploration refute any conclusion that it completed the exploration and development work there. Finally we give little weight to this limited action on the part of petitioner because no further steps were taken towards active participation in mining operations there or elsewhere subsequent to April 14, 1942. Such activity was a mere isolated occurrence. Thus we conclude that in 1944 petitioner was not engaged in discovering deposits of chrome ore, building mines, extracting ore or treating same. It was not engaged in "mining" in the usual sense or as defined in section 114 (b) (4) (B).

It is a well recognized principle that tax exemptions are not to be lightly inferred, *Heiner* v. *Colonial Trust Co.*, 275 U. S. 232; *United States* v. *Stewart*, 311 U. S. 60. In view of Congressional silence regarding lessors of mining properties, we are convinced it would be an undue extension of the statutory language to hold that section 731 covers a corporation such as petitioner, which bought up a few mining claims in a proven area, which started but never completed the exploration or development of any mining properties nor extracted ore therefrom, and which quickly lapsed into the passive role of a lessor holding its claims for lease to a producer willing to carry out all the mining operations necessary to mine and market chromite. We therefore hold that in 1944 petitioner was not entitled to the exemption contained in section 731. The concessions set forth in the stipulation of facts will be taken into account in the recomputation herein directed.

Petitioner abandoned the only error assigned as the basis of its petition in Docket No. 23902.

Reviewed by the Court.

> *In Docket No. 18515, decision will be entered under Rule 50.*
>
> *In Docket No. 23902, decision will be entered for respondent.*

---

ARUNDELL, *J.*, dissenting: It seems to me that the construction given to section 731 in the majority opinion is entirely too narrow and serves to defeat the very purpose of its enactment.

In 1940, there was a crying need for the production of certain strategic war materials, of which chromite was one. We had depended on foreign sources for our supply and the war activities of the enemy made likely the stoppage of our importations. To give encouragement to the discovery and development of our domestic sources of supply, Congress enacted section 731 of the Internal Revenue Code which provided that:

In the case of any domestic corporation engaged in the mining of * * * chromite * * *, the portion of the adjusted excess profits net income attributable to such mining in the United States shall be exempt from the tax imposed by this subchapter.

There can be no question but that the income with which we are concerned was attributable to the mining of chromite. But it is said that the petitioner was not engaged in mining and therefore may not have the benefit of the statute.

The petitioner was organized in 1941 for the sole purpose of taking title to a group of mining claims believed to contain chromite and with the view to their exploration and development. By April 1942, it had opened tunnels and had performed various other work in order to locate the deposits of chromite and to prepare for the actual removal of the ore. Apparently the petitioner was financially unable to carry out the operation itself and a lease arrangement was made with Robertson under which the petitioner was to receive a gross royalty of 20 per cent of the amounts realized from the sales of ore.

To deny petitioner the benefits of section 731 because it did not engage in the actual extraction of ore from the claims is to say that Congress intended only to accelerate the production of chromite from mines already existing and operating within the United States or to benefit only those firms possessed of sufficient financial resources to undertake and complete the exploitation of mining properties without outside assistance. In my opinion, this result is in direct conflict with

the intent evidenced by Congress in its Committee Reports*, which indicate that the statute was designed to encourage the discovery, exploration and development of mines containing these strategic metals as well as to encourage the day-to-day removal of the ore.   Therefore, it seems to me that recognition of the underlying necessity for the extension of this exemption and the specific purposes of Congress in granting this benefit require that the petitioner be regarded as having been engaged in the mining of chromite within the meaning of section 731 during 1944.

VAN FOSSAN, JOHNSON, and TIETJENS, *JJ.*, agree with this dissent.

---

*See H. Rep. No. 3002, 76th Cong.. 3d sess., 1940-2 C. B. 548, 559 ; 86 Cong. Rec., pp. 12347, 12348, 12920 ; H. Rep. No. 1040. 77th Cong., 1st sess., 1941-2 C. B. 413. 434 ; 87 Cong. Rec., pp. 6710-11, 6725-26, 7440-41 ; S. Rep. No. 1631, 77th Cong., 2d sess., 1 C. B. 504, 536-538.