United Mercury Mines Company, a Corporation v. Commissioner.
United Mercury Mines Co. v. Commissioner
Docket No. 57500.
United States Tax Court
T.C. Memo 1956-277; 1956 Tax Ct. Memo LEXIS 13; 15 T.C.M. (CCH) 1444; T.C.M. (RIA) 56277; December 26, 1956
John A. Carver, Jr., Esq., Box 2574, Boise, Ida., and Dale Clemons, Esq., for the petitioner. John D. Picco, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion This proceeding involves a deficiency in excess profits tax of petitioner for the year 1944 in the amount of $113,453.68. The sole issue presented is whether petitioner is exempt from excess profits tax on income it received in 1944 under a "Conveyance, Royalty Agreement, and Option," dated December 31, 1941, by virtue of the provisions of section 731 of the Internal Revenue Code of 1939. Findings of Fact The stipulated facts are found accordingly. Petitioner is an Idaho corporation organized in 1921. Its authorized capital is $500,000, consisting of five million shares of the par value of 10 cents per share, *14 all of which is issued and outstanding. Petitioner filed its federal income and declared value excess profits tax return for the year 1944 with the collector of internal revenue for the district of Idaho. It did not file an excess profits tax return for that year. By its charter petitioner is authorized generally to engage in the mining business, to acquire, hold, manage, develop, operate, and work mining properties, together with the usual incidental powers. Since its incorporation petitioner has been so engaged in an area known as the Yellow Pine Mining District, Valley County, Idaho. In general, the mineral properties belonging to petitioner in 1941 consisted of approximately 700 mining claims covering about 14,000 acres. These properties may be designated as follows: 1. The Stibnite Property. This consisted primarily of two groups of mining claims, the first known as the Meadow Creek group, and the second known as the Hennessy group or East Fork group. The Hennessy group contained large deposits of Tungsten ore. 2. The Midnight Group. This consisted of mining claims located near the Stibnite property. 3. Smokey Ridge Group. This consisted of mining claims located *15 near the Stibnite property. 4. Antimony Ridge Group. This consisted of quicksilver, gold and antimony mining claims lying northwest of the Stibnite property. 5. Cinnabar Group. This consisted of quicksilver mining claims lying east of the Stibnite property. The Bradley Mining Company, hereinafter referred to as Bradley, was organized under the laws of California for the purpose of engaging in the mining business. Bradley was a large operating concern with considerable working capital. On August 5, 1927, petitioner negotiated an option agreement with Bradley for the development and operation of the Meadow Creek and Cinnabar claims. The agreement also granted Bradley an option to purchase petitioner's title in the mining claims for $1,500,000. In the meantime petitioner was to receive certain royalty payments which were to be credited toward the purchase price. The agreement of August 5, 1927, did not extend to the Hennessy mining claims which were purchased outright by Bradley in 1927. After spending approximately $30,000 on the Hennessy claims, Bradley abandoned them. Petitioner reacquired the Hennessy claims and they were included, along with the Meadow Creek claims, in *16 subsequent agreements executed between Bradley and petitioner in 1930 and 1939. These two groups of claims comprised the Stibnite mining properties heretofore mentioned. The acquisition of the Hennessy claims was described in the option agreement dated May 16, 1939, as follows: "AND WHEREAS, subsequent to said agreement on October 3, 1930, the Yellow Pine Company and its successor in interest, the Bradley Mining Co., acquired a group of mining claims known as the Hennessy Groupt, [Group] which said group of claims was acquired with the understanding and agreement that it would become a part of the Meadow Creek Group of lode mining claims and to be owned by the United Mercury Mines Company until the acquisition of the entire Meadow Creek Group by the Yellow Pine Company;" * * *
On September 4, 1939, Bradley and petitioner executed a "Form of Agreement For Mineral Explorations" granting to the Government the right to enter upon the Stibnite property for the purpose of prospecting, drilling, and exploring for minerals. The exploratory operations were not commenced until the summer of 1941. The drilling was at Government expense and under the supervision of the Bureau of Mines, *17 and resulted in the discovery of tungsten. The contractual relationship which had existed between Bradley and petitioner from 1927 to 1941 was terminated on December 31, 1941, and on the same date a new agreement designated "Conveyance, Royalty Agreement, and Option," was executed. That agreement provides in part as follows: "That the said UNITED [petitioner] for and in consideration of the royalty hereinafter agreed to be paid by BRADLEY * * * has GRANTED, BARGAINED, SOLD, and ASSIGNED, and does by these presents grant, bargain, sell and assign, unto BRADLEY * * * all of the following described lode and placer mining claims situate in the Yellow Pine Mining District, Valley County, State of Idaho, consisting of two groups of lode mining claims, the first of said groups being commonly known as the MEADOW CREEK Group, and the second of said groups being commonly known as the HENNESSY Group * * *. "Together with the personal property situate upon said mining claims; "Together with all millsites, power plants, transmission lines, dams, reservoirs, mills, dwellings, buildings, structures, water rights, tail races, tailing sites, tailing dams or easements * * * TO HAVE AND TO *18 HOLD, subject to the royalty herein reserved and retained by UNITED, all and singular the said premises, together with the appurtenances and privileges thereunto incident, unto the said BRADLEY, its successors and assigns, forever. * * *
"For and in consideration of the premises * * * BRADLEY * * * does hereby covenant, promise and agree to pay to UNITED * * * a royalty of five percent (5%) on all net smelter returns, net revenue, and net mint returns, as defined herein * * *; the payment of said five percent (5%) royalty to begin with the first returns received on concentrates shipped from Cascade, Idaho, after Midnight, December 31, 1941, and to continue thereafter for nine hundred and ninety-nine (999) years and as long thereafter as minerals, ores or values shall be extracted, mined or taken from the above described property * * *. * * *
"It is agreed that the time, amount, extent and manner of conducting mining operations and development work upon or in the above-described mining claims shall be in the sole discretion of BRADLEY * * * and that the failure of BRADLEY to mine shall not be held to be a condition subsequent defeating the conveyance made hereby. "Anything *19 in this agreement contained to the contrary notwithstanding, it is the intention of the parties to this agreement that the full ownership, possession and control of all the properties above described, * * * and all of the personal property acquired and/or used on or in connection with the operation and development of the above described properties, shall be vested in BRADLEY, and the UNITED shall have no interest in fee in or to said properties, or in and to any of the personal property acquired and/or used in connection with the operation and development of said properties; * * *." After 1941 the operations conducted by Bradley were primarily directed toward the development and mining of tungsten from the Hennessy mine. Between 1927 and 1933 Bradley expended in excess of $100,000 per year in development of the properties under the option agreements. The option agreement dated May 16, 1939, provided in part as follows: "AND WHEREAS, the party of the second party [Bradley] went into actual possession of said properties and began bona fide development work thereon upon the signing of and in accordance with the provisions of said option agreement dated August 5th, 1927, and has *20 during each and every year thereafter expended in developing and equipping in, upon, and/or for the benefit of said properties a sum of not less than twenty-four thousand dollars ($24,000.00);" Bradley erected mine buildings, a concentration plant, and other buildings, and installed the power generating equipment. It owned the equipment, machinery, and other personal property located at the mine. Bradley operated the Stibnite properties. It extracted, transported, marketed and sold the ore and received the payments from purchasers. At no time before or after the 1941 contract did petitioner engage in the removal of ore for sale from the Stibnite and Midnight group of properties. The relationship between petitioner and Bradley was not always harmonious. Differences frequently arose with respect to provisions of the agreements which were amicably adjusted. However, sometime subsequent to the taxable year petitioner instituted a suit against Bradley which involved an issue with respect to royalty computations. United Mercury Mines v. Bradley Mining Co., 233 Fed. (2d) 205 (C.A. 9). Petitioner was engaged in mining the Cinnabar property for quicksilver in 1944 and 1945. *21 In 1941 petitioner deeded a 55 per cent interest in the Cinnabar property to Bonanza Mines, Inc. The Cinnabar property had not been worked prior to the transfer. Thereafter a reduction plant was built and the property was operated as a joint venture by petitioner and Bonanza. Petitioner also worked the Antimony Ridge property for antimony in 1944 and 1945. This mining operation resulted in losses during the period 1941 to 1944 inclusive. In 1947 the Antimony Ridge property was transferred to Bradley. In its income and declared value excess profits tax return for 1944 petitioner reported the following: Royalty income under contract
dated December 31, 1941
$219,439.42
Income from operation of Anti-
mony Ridge mine
(14,160.36) Loss
Income from operation of Bo-
nanza mine
(15,035.87) Loss
Total income reported
$190,243.19
In his deficiency notice the respondent determined that petitioner was not engaged in mining strategic minerals from the Stibnite property during the year 1944 within the meaning of section 731 of the Internal Revenue Code of 1939, and the income realized from the Stibnite property during 1944 is not exempt from taxation under the provisions *22 of Subchapter E of the Internal Revenue Code of 1939, as amended. Petitioner was not engaged in the mining of tungsten during the taxable year 1944 within the purview of section 731 of the Internal Revenue Code of 1939. Opinion LEMIRE, Judge: The question presented is whether petitioner was engaged in the mining of tungsten within the meaning of section 731 of the Internal Revenue Code of 1939[1] during the taxable year 1944, so that its adjusted excess profits net income was exempt from the excess profits tax. The respondent determined that petitioner was not so engaged. Petitioner filed no excess profits tax return for that year. The respondent determined that petitioner was not exempt from excess profits tax, and included the royalty income received by petitioner from Bradley Mining Company, which owned and operated the Hennessy property from which the tungsten was extracted, in determining petitioner's adjusted excess profits net income. The amounts involved are not in controversy. *23 Section 731 of the 1939 Code, as amended, was construed in Oregon Chrome Mines, Inc., 15 T.C. 389, affd. 192 Fed. (2d) 783 (C.A. 9), wherein the purpose and legislative history of the provision was reviewed. We think it unnecessary to reiterate what has there been stated. In the instant proceeding, as in the Oregon case, supra, the question presented involves an interpretation of the phrase "engaged in mining" within the meaning of section 731 of the Code. In the Oregon case the word "mining" was construed to refer to the extraction of ore from the earth. It was there held that a lessee of a mine receiving royalty income from the lessor which extracted the strategic mineral was not entitled to exemption from excess profits tax under section 731. In the taxable year 1944 petitioner received royalty income pursuant to the agreement dated December 31, 1941, with Bradley. The Hennessy property which produced the tungsten was owned and operated by Bradley. It owned the buildings and equipment and extracted the ore. Bradley also received the sales price upon which the royalty income in controversy was computed. The respondent relies solely upon the Oregon *24 case, supra, as authority here. After a careful review of the entire record we are convinced that the instant case presents no material and controlling facts that would prevent the application of the rationale of the Oregon case, supra. Petitioner, on brief, concedes that it did not extract minerals from the Stibnite properties during the taxable year involved. It states that a "slavish application of the literal language of the Ninth Circuit opinion in Oregon Chrome might foreclose the relief sought" and it urges a reconsideration and a broadening of the scope of the meaning of the phrase "engaged in mining," as used in section 731. This we decline to do. We are of the opinion that the Oregon case, supra, was correctly decided and that it is a controlling authority. Any appeal taken herein will go to the same Court of Appeals which affirmed our decision in the Oregon case, supra. We therefore hold that the royalty income received by petitioner in the taxable year 1944 with respect to tungsten extracted from the Stibnite property was not exempt from excess profits tax under section 731 of the Internal Revenue Code of 1939. The respondent's determination is sustained. Decision *25 will be entered for the respondent. Footnotes
1. SEC. 731. CORPORATIONS ENGAGED IN MINING OF STRATEGIC MINERALS. In the case of any domestic corporation engaged in the mining of * * * tungsten * * * the portion of the adjusted excess profits net income attributable to such mining in the United States shall be exempt from the tax imposed by this subchapter. The tax on the remaining portion of such adjusted excess profits net income shall be an amount which bears the same ratio to the tax computed without regard to this section as such remaining portion bears to the entire adjusted excess profits net income.↩